*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KRISTOPHER WHITAKER,

UNPUBLISHED
May 23, 2024

        Plaintiff-Appellant,

v

No. 363932
Wayne Circuit Court
LC No. 20-014096-NI

FARM BUREAU INSURANCE COMPANY,

        Defendant-Appellee.

Before: BORRELLO, P.J., and SWARTZLE and YOUNG, JJ.

PER CURIAM.

Kristopher Whitaker was injured in a car accident in May 2020. While he had health insurance through his employer, he did not have automobile insurance. He applied for personal injury protection (PIP) benefits under the no-fault act, MCL 500.3101 *et seq*., and his claim was assigned to Farm Bureau Insurance Company (Farm Bureau). When they declined to pay, Whitaker filed a complaint against them for nonpayment of PIP benefits and declaratory relief. Before trial, the circuit court granted Farm Bureau's motion in limine to preclude any claims by Whitaker for payment of bills already covered by other insurers. Later, the court dismissed Whitaker's case with prejudice when he failed to appear on the second day of trial.

On appeal, Whitaker argues that (1) the trial court abused its discretion when dismissing his case—especially where it never evaluated on the record other options besides dismissal and the factors set forth by this Court in *Vicencio v Ramirez*, 211 Mich App 501; 536 NW2d 280 (1995)[1]—and erred by ruling that Whitaker had to be present in court for trial to continue; and (2)

---

[1] We agree with the dissent that Whitaker never raised and thus did not preserve his particular argument related to *Vicencio* and the availability of lesser sanctions in the trial court. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 2-3 ("To preserve an issue, the party asserting error must demonstrate that the issue was raised in the trial court . . . . If a litigant does not raise an issue in the trial court, this Court has no obligation to consider the issue."). Nevertheless, "this Court may

the trial court abused its discretion by excluding from evidence Whitaker's medical bills already paid by other insurers.

First, because the trial court's evidentiary ruling was not an abuse of discretion, we affirm it. Secondly, although dismissal with prejudice was generally within the trial court's discretion under the instant circumstances, the trial court abused its discretion by not explicitly evaluating available lesser sanctions on the record. We remand for further proceedings consistent with this opinion.

## I. BACKGROUND

After Whitaker filed his complaint, Farm Bureau filed a motion in limine to preclude any claims by Whitaker for payment of bills already covered by Medicaid, Medicare, or Blue Cross Blue Shield [BCBS].[2] Farm Bureau argued that it was not liable for any of Whitaker's asserted medical expenses already paid by other health insurers. At a hearing on the motion, counsel for Whitaker argued that Farm Bureau was liable for Whitaker's healthcare expenses as the insurer of first priority and was required to reimburse any amounts paid by another insurer like Medicaid, Medicare, or BCBS. The trial court, without much discussion, disagreed and granted Farm Bureau's motion. The trial court did state, however, that although "there can always be a lien put against" payments from other insurers, "that's different than an evidentiary ruling."

Whitaker moved for relief from the trial court's ruling under MCR 2.612(C)(1)(f). The ruling was erroneous, Whitaker argued, because (1) Equian, the subrogation vendor for Whitaker's health plan with BCBS, established a lien concerning BCBS's payments; (2) his BCBS plan was a self-funded ERISA[3] plan through Whitaker's employer; (3) a no-fault insurer takes priority over an ERISA plan where the plan contains unambiguous coordination-of-benefits provisions; (4) no-fault insurers similarly take priority over both Medicare and Medicaid; and, therefore, (5) any "prior payments, late payments, [and] non-payments are all relevant [to Whitaker's damages from Farm Bureau]." This was the first time Whitaker raised this specific argument related to his BCBS coverage being a self-funded ERISA plan, and Equian's lien and right of subrogation regarding the BCBS bills.

In response, Farm Bureau countered that Whitaker's motion was untimely, and that Farm Bureau was not liable for Whitaker's medical expenses "that were contractually deemed paid in

---

overlook preservation requirements if . . . the issue involves a question of law and the facts necessary for its resolution have been presented." *Id.* at ___; slip op at 3. Because this issue involves the legal sufficiency of the trial court's on-the-record justification for dismissal and the facts necessary for resolution are undisputed and available, we consider Whitaker's argument in full.

[2] Although this motion and the parties' arguments in the trial court—like their continued arguments on appeal—addressed Medicaid, Medicare, and BCBS, the bills at issue here involve $40,000 paid by BCBS only, not Medicaid or Medicare.

[3] See the Employee Retirement Income Security Act, 29 USC 1001 *et seq*.

full . . . ." The trial court denied Whitaker's motion without holding a hearing or explaining its reasoning.

A jury trial commenced on Whitaker's claims on October 25, 2022. After jury selection, before the presentation of witnesses, and outside the jury's presence, the parties and the trial court again discussed the issue of Whitaker's medical bills; but the court stated that it already ruled on this issue and reiterated that any already-paid bills would be excluded from evidence.[4] The trial court said, "Whitaker has no financial responsibility to this claim because the claim has been paid," and "[i]f Equian has an issue, they [can] go after Farm Bureau."

The court ultimately adjourned trial until the next day so Whitaker could call Farm Bureau's claims adjuster, who was unavailable that first day to testify. Notably, this witness was only unavailable because the court had previously granted Whitaker's pretrial motion to preclude her from testifying. At trial, Whitaker decided that he wanted to call her as his first witness. When trial resumed the next day, Whitaker's counsel appeared, but Whitaker was absent. Whitaker's wife and the owner of a home care facility, who both were subpoenaed to be witnesses at trial, were also absent. Farm Bureau orally moved to dismiss the case with prejudice. The trial court granted this motion, citing the witnesses' absences, Whitaker's conscious decision not to appear—especially after trial was earlier adjourned at his counsel's request—and the unfairness of these circumstances for the jury. The trial court entered an order dismissing the case with prejudice for the reasons stated on the record. This appeal followed.

## II. STANDARDS OF REVIEW

We review a trial court's decision to dismiss an action for an abuse of discretion. *Vicencio*, 211 Mich App at 506. "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *Ickes v Korte*, 331 Mich App 436, 440; 951 NW2d 699 (2020). "A trial court necessarily abuses its discretion when it makes an error of law." *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

We similarly review a decision to exclude evidence for an abuse of discretion. *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016). We review de novo questions of law underlying evidentiary rulings, including the interpretation of statutes and court rules. *Id*. "The admission or exclusion of evidence because of an erroneous interpretation of law is necessarily an abuse of discretion." *Id*. However, "[a] decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Morales v State Farm Mut Auto Ins Co*, 279 Mich App 720, 729; 761 NW2d 454 (2008). "Moreover, even if a court abuses its discretion in admitting or excluding evidence, the error will not merit reversal unless a substantial right of a party is affected, MRE 103(a), and it affirmatively appears that the failure to grant relief is inconsistent with substantial justice, MCR 2.613(A)." *Id*.

---

[4] The trial court did allow Whitaker to introduce a single medical bill paid in full by Farm Bureau, but that Farm Bureau allegedly paid late, regarding Whitaker's claim for interest and attorney fees. This bill was never paid by BCBS or another insurer, and is irrelevant to this appeal.

Regarding the evidentiary issue, to the extent that Whitaker relies on his health insurance being an ERISA plan and Equian's lien and right of subrogation regarding the BCBS bills, these aspects of his argument were raised and supported for the first time in his motion for relief from the trial court's evidentiary ruling. "As a general rule, an issue is not preserved if it is raised for the first time in a motion for reconsideration in the trial court." *George v Allstate Ins Co*, 329 Mich App 448, 454; 942 NW2d 628 (2019); see also *Glasser v Scott*, unpublished[5] per curiam opinion of the Court of Appeals, issued October 20, 2022 (Docket No. 357166), pp 9-10 (likening a motion for relief from judgment to a motion for reconsideration, and concluding that the party failed to preserve an argument raised for the first time in a motion for relief from judgment).

Still, because letters and bills related to this argument were attached to a lower-court filing, they are part of the record and may be considered on appeal. See MCR 7.210(A)(1). "Moreover, to the extent that the aspects of [an issue] are unpreserved, [this Court] may overlook the preservation requirements in civil cases if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *George*, 329 Mich App at 454. Because this issue essentially involves the legal admissibility related to payments indisputably made by Whitaker's private insurer but allegedly payable by Farm Bureau under the no-fault act, we consider all aspects of Whitaker's argument on appeal.

## III. ANALYSIS

Whitaker argues that the trial court abused its discretion when dismissing his case for his failure to appear at the second day of trial—particularly where it never evaluated on the record other options besides dismissal and factors set forth in *Vicencio*, 211 Mich App 501—and erred by ruling that Whitaker had to be present in court for trial to continue. He also argues that the trial court abused its discretion by excluding from evidence his medical bills paid by Medicare, Medicaid, and BCBS.[6]

## A. DISMISSAL

"[T]rial courts possess the inherent authority to sanction litigants and their counsel, including the power to dismiss an action." *Maldonado v Ford Motor Co*, 476 Mich 372, 376; 719 NW2d 809 (2006). "This power is not governed so much by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id*.

"A court, in its discretion, may dismiss a case with prejudice or enter a default judgment when a party or counsel fails to appear at a duly scheduled trial." *Vicencio*, 211 Mich App at 506, citing MCR 2.504B(1) ("If a party fails to comply with these rules or a court order, upon motion by an opposing party, or sua sponte, the court may enter a default against the noncomplying party

---

[5] "Unpublished opinions are . . . not binding authority but may be persuasive or instructive." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020).

[6] As noted, the bills excluded related only to $40,000 paid by BCBS, not Medicaid or Medicare.

or a dismissal of the noncomplying party's action or claims."). See also MCR 2.506(A)(1) ("The court in which a matter is pending may by order or subpoena command a party or witness to appear for the purpose of testifying in open court on a date and time certain and from time to time and day to day thereafter until excused by the court . . . ."). Relatedly, our Supreme Court has ruled dismissal proper where the plaintiffs "deliberately" delayed the case, albeit before trial and contrary to a court rule not at issue here, "as part of a historical pattern of gamesmanship and delay" prejudicial to the defendants. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 17.

However, "[d]ismissal is a drastic step that should be taken cautiously." *Vicencio*, 211 Mich App at 506; see also *id*. at 507 ("Our legal system favors disposition of litigation on the merits."). "Before imposing such a sanction, the trial court is required to carefully evaluate all available options on the record and conclude that the sanction of dismissal is just and proper." *Id*. at 506-507, citing *Hanks v SLB Management*, 188 Mich App 656, 658; 471 NW2d 621 (1991). A court that fails to evaluate other available options on the record necessarily abuses its discretion. See *id*. at 507. "The trial court must also explain its reasons for dismissal on the record in order to allow for meaningful appellate review." *Gueye v State Farm Mut Auto Ins Co*, 343 Mich App 473, 490; 997 NW2d 307 (2022) (quotation marks and citation omitted).

Further, as stated in *Vicencio*, a court "should consider" the following factors before imposing a sanction of dismissal:

> (1) whether the violation was wilful [sic] or accidental; (2) the party's history of refusing to comply with previous court orders; (3) the prejudice to the opposing party; (4) whether there exists a history of deliberate delay; (5) the degree of compliance with other parts of the court's orders; (6) attempts to cure the defect; and (7) whether a lesser sanction would better serve the interests of justice. [*Vicencio*, 211 Mich App at 507.]

These factors are not exhaustive. *Id*.

As an initial matter, Whitaker's argument appears to misconstrue the requirements of *Vicencio*. *Vicencio requires* that trial courts carefully evaluate all available options short of dismissal on the record and conclude dismissal is just and proper. *Vincencio* only *suggests* that courts *should consider* the various non-exhaustive factors enumerated therein when conducting this analysis. See *Gueye*, 343 Mich App at 493-494 ("[B]efore dismiss[al] . . . , a trial court should consider the applicable *Vicencio* factors, including the availability of alternative sanctions, and decide whether dismissal is just. . . . On remand, the trial court should consider the applicable factors discussed in *Vicencio* to determine whether the sanction of dismissal is appropriate [here]."). To the extent that Whitaker argues in part that the trial court necessarily abused its discretion by not addressing the *Vicencio* factors on the record, the court was not required to do so. Nevertheless, these factors remain highly relevant to determine the availability of other options and whether dismissal is just and proper in a given case. And the court must still sufficiently explain its reasoning for dismissal on the record in order to facilitate meaningful appellate review.

Further, the parties dispute whether the trial court based its dismissal on Whitaker's failure to appear alone, or on "the totality of abuses committed by [Whitaker] with regard to four different

witnesses"—those being Whitaker himself, his wife, his care provider, and Farm Bureau's claims adjuster. They also dispute whether the trial court ever verbally ordered Whitaker to personally appear on the second day of trial. To answer these questions, we turn to the record.

## 1. THE RECORD

At the first day of trial, the court expressed frustration when Whitaker's counsel sought to call the claims adjuster as his first witness:

> *The Court*: Thank you. Mr. Fortner [Whitaker's counsel], do you want to call your first witness, please.
>
> [*Whitaker's Counsel*]: Well, yeah. I wanted to call the adjuster and she's not here. And so, that's my first witness, and we've got a number of other issues we've got to address.
>
> *The Court*: No. You're going to call your first witness and it won't be the adjuster, because there was already a motion ruled on the adjuster, okay.
>
> \* \* \*
>
> Okay. There was a motion that you had filed with this court. The Court ruled in your favor excluding the adjuster. Now you want the adjuster.
>
> The Court has already had that record made with defense counsel he'll produce her [sic]. But you asked the Court not to.
>
> \* \* \*
>
> Okay. So Mr. Fortner, we're going to do this one more time, okay? Call your first witness.
>
> \* \* \*
>
> [*Whitaker's Counsel*]: . . . That's the witness I want to call. If you preclude me from calling that witness, then we'll—
>
> *The Court*: Okay. Mr. Fortner, you know what you did. You asked this Court to rule on a motion that you filed with this court last week excluding the witness that you're now asking the Court to call. And the Court granted that request.
>
> \* \* \*
>
> [*Whitaker's Counsel*]: So Your Honor, let me do this then. Let me . . . ask you to disqualify yourself. Because evidently you lack and [sic] ability to be fair and impartial.

The trial court then excused the jury for lunch and responded as follows:

-6-

How dare you, Mr. Fortner, act this way in front of this jury. How dare you stand here in front of this jury on a motion that you filed before this Court last week asking that their adjuster be stricken, and the Court granted your motion.

Now you're standing up here and you're making it sound like they're not bringing the witness, and you know exactly what happened.

This is such a contentious evidentiary fight that we're having. It's so unnecessary.

And you know what? You can't continue a case like this. You just can't continue doing the case like this.

And in all fairness to this Court—and you can make your motion. Make your motion, okay.

But in all fairness to this Court, the Court said this morning, if you had a change of heart and said, [y]ou know, now all of a sudden, Judge, I really want the adjuster to be present, the Court said, [f]ine. That was this morning. It's only a quarter to 12:00 [p.m].

But for you to stand up in front of this jury and argue to the Court and to the jury you have a right to call her [is wrong].

After further admonishing Whitaker's counsel on this matter and for his argumentative posture with the court, the trial court ultimately agreed to allow the claims adjuster to testify:

It's up to me. And you know what? If the Court granted your motion to exclude her as a witness, okay, and now you've had a second—you know, you've had a second thought about it, which is apparently what happened this morning, the Court said, Okay, fine.

You know, I don't usually do this. But you know, I'm trying to accommodate here the best that I can. Because we have a jury selected and we just need to get on with this case, okay.

Bring the adjuster in. Call her up. Tell her to get over here, okay.

Farm Bureau said the adjuster was currently in Lansing but could appear by the next day. After Whitaker's counsel attempted to make further objections regarding the claims adjuster's absence, the trial court stated:

What is it that you want this Court to do? On one hand you say you don't want her, you want the Court to grant your motion to exclude, which the Court did. And now you're saying you want her to testify.

And the Court said to you earlier this morning—which now we've wasted untold time here on this issue—that if that's what you really want after a moment

of reflection and you decide, [y]ou know what? I really do want to call her, I'm not going to preclude you from calling her.

But if she's in Lansing, she can't be here to testify as your first witness. Now, you asked for that, Mr. Fortner . . . . You asked that this Court grant your motion, and the Court did.

And so, this is nothing short of gamesmanship. This is—Honest to goodness, I've never seen this. Never seen this.

\* \* \*

If you want her, the Court has already said to you this morning the Court will set that Order aside and you can call her as a witness. But she's not available right now because she's in Lansing, okay.

Just because you show up this morning and say, [o]h, by the way, Judge, I really wanted you to grant my motion. You granted my motion, but now, you know, I want to call her as a witness.

Don't confuse it. We're all assuming that she's not going to be called because the Court granted your motion.

That's all I'm going to say about it. I don't want to hear any more arguments from either one of you.

\* \* \*

The Court has already said, yeah, these are extraordinary circumstances. Again, I've just never seen anything like this. It's just nothing short of gamesmanship.

And the contentious evidentiary fights that [both parties] have had, listen, you cannot run a case this case [sic]. You just cannot run a case like this. It's not fair to your clients. It's just not.

Farm Bureau then confirmed that the claims adjuster could appear to testify at 9:00 a.m. the next day.

The trial court subsequently excused the jury until then. After the jury was excused and just before trial was adjourned, the following exchange took place in front of counsel for both parties (Whitaker by this point had left for work and counsel waived his presence):

*The Court*: . . . So let's just look at what we're doing tomorrow.

The jury will come back a quarter to 9:00 [a.m]. 9:00 [a.m.] we'll start up.

And Mr. Fortner, you're going to call what, the claims adjuster first, or Mr. Whitaker, or Mr. Whitaker's wife?

[*Whitaker's Counsel*]: Yeah. I've got to figure out her timing. And so, yeah, I've got to figure her timing out. But I want to get everybody done by noon.

*The Court*: Yeah; I think we can [do that]. All right. So that will be the lineup, and then you'll have your people ready.

Notably, Whitaker's counsel stated at the outset of trial that Whitaker and his wife—and "possibly" the care provider and claims adjuster—would testify on Whitaker's behalf.

The next day, the trial court initially noted that Whitaker was not ready to testify—and his wife was unavailable—on the first day of trial.[7] "So the Court adjourned [trial] until this morning in order to give [Whitaker's counsel] an opportunity to line up the witnesses. And now we're at the point where [Whitaker] is not here." After Farm Bureau moved to dismiss, the trial court acknowledged that the claims adjuster, the first intended witness for Whitaker, was present. But the court said, "[Whitaker] has to be here." After the court gave Whitaker's counsel the opportunity to contact Whitaker and was informed he could not appear until later that afternoon, the following exchange took place:

*The Court*: [Whitaker] was here yesterday; correct?

[*Whitaker's Counsel*]: Yes, ma'am.

*The Court*: Yeah. He heard what you said to the Court, that as the Court had indicated, we could take his testimony first. You indicated he wasn't ready.

You talked to him out in the hallway. He wasn't able to testify, but he'd be ready today. So he understood that he needed to be here. This is his case; correct?

[*Whitaker's Counsel*]: Yes, Your Honor. You know, my anticipation was I was going to spend some time with the adjuster. I figured I wouldn't need him until regard 2:00 [sic] anyway. And so the record is real clear, I didn't tell him not to come—

*The Court*: No. You said to us that you would have your case done [b]y noon.

[*Whitaker's Counsel*]: And I expected that this wife would be here this morning also.

*The Court*: And she's not here.

_____

[7] These facts appear to have been discussed off the record at the first day of trial.

\*   \*   \*

So you don't know where she's at.

[*Whitaker's Counsel*]: I haven't spoken to her. But so the record is real clear, the adjuster is here today. I'm ready to proceed with the adjuster.

And so the record is totally clear, [opposing] counsel represented that the Attendant Care provider was not here yesterday, and that's not true. She was here [yesterday,] and she'll be here today. I had all of them scheduled.

*The Court*: The problem is, is Mr. Whitaker is not here.

The court ultimately reasoned as follows:

You know, this is an unfortunate set of circumstances. But you know, one that could have been easily avoided.

Your client, with all due respect, [plaintiff's counsel], and just so the record is clear, the Court takes this very seriously. I believe everyone has a right to have due process and have their case heard properly before a court of law.

We selected a jury yesterday. That jury was sent home early because of some of the issues that had cropped up during the course of the day, once [sic] of which is there was a desire to have the claims adjuster here, even though the Court had signed an Order at the request of the plaintiff striking the claims adjuster as a witness.

\*   \*   \*

And the Court also made it clear after a representation was made by counsel for the plaintiff that Mr. Whitaker would testify; his wife—and that's Mrs. Whitaker—she would testify this morning. And you would also be calling the claims adjuster, and the Attendant Care provider.

The Court is in a very difficult position, because you've indicated to this Court that your client has elected to go to work. He never notified you. You had to track him down. He never notified the Court. He doesn't get to just set the—

Here's the thing that I think everyone needs to understand.

People don't get the right simply because they have chosen to file a lawsuit to dictate the terms of how the case is going to proceed, or in fact how the trial is going to proceed. And why is that?

Well, first of all, we have rules that we have to follow. And secondly, we have to respect the sanctity of a jury. And that jury was told to be here at a quarter to 9:00 this morning, and they were all here at a quarter to 9:00.

-10-

And they're sitting back in the jury room waiting patiently, having been sent home prematurely yesterday after we told them when we were picking the jury that this would last about a day-and-a-half. And had we had no problems, we would have [done that].

[Another] thing is, is that Mr. Whitaker was advised by this Court, and indeed by his attorney that we would start promptly at 9:00 a.m.

At no time during that proceeding did he ever indicate[], or did you, [plaintiff's counsel], ever indicate that, you know, perhaps he would be unavailable because he had to work.

\* \* \*

. . . [I]t is now 10:00 [a.m.]. It's clear to this Court . . . that Mr. Whitaker has no intentions of showing up before at least 2:00 [p.m.]—so he says—that's when he gets off [work].

So it won't be 2:00 [p.m]. The whole day will be gone.

The jurors have been summoned here unnecessarily and adjusted their schedules so they could do their civic duty, and how do we treat them[?] This is how we treat them.

\* \* \*

Here's what the Court is going to do. The Court will grant [the motion to dismiss] because we do know what th[is] situation is.

Sometimes this happens, [and] we don't know. But we do know, and that he's not here [sic]. Mr. Whitaker is not here on his own volition because he has elected to go to work, even though he was advised by this Court to be back here at 9:00 a.m. this morning so that we could promptly continue this trial.

With this record in mind, we turn now to the salient disputes concerning this issue.

## 2. ORDER TO APPEAR

Viewing the record, there admittedly was never any clear command from the court, verbal or otherwise, for Whitaker to personally appear to testify at the second day of trial. See MCR 2.602(A)(1) (stating that, with limited exceptions not applicable in this case, "all judgments and orders must be in writing, signed by the court"); see also *Arbor Farms, LLC v GeoStar Corp*, 305 Mich App 374, 387-388; 853 NW2d 421 (2014) ("It is a settled maxim that courts generally speak through their judgments and decrees, and not their oral statements or written opinions. However, there are circumstances in which an oral ruling has the same force and effect as a written order, as when, for example, an oral ruling clearly communicates the finality of the court's pronouncement. When assessing whether an oral ruling has equal effect to that of a written order, we consider

-11-

whether the oral ruling contains indicia of formality and finality comparable to that of a written order.") (cleaned up; citations omitted).

Although the trial court stated that it "advised" Whitaker both that the second day of trial would start at 9:00 a.m. *and* that Whitaker "[had] to be back" by that time, its initial reference in this regard on the record of the first day of trial, notably after Whitaker himself left the proceeding, merely stated that trial would resume at 9:00 a.m. Whitaker's counsel then informed the court that he, while uncertain on the timing for the particular witnesses, intended on the second day to question Whitaker, Whitaker's wife, and the claims adjuster, all before noon. While the trial court told Whitaker's counsel, "So that will be the lineup [tomorrow], and then you'll have your people ready," the court never actually commanded Whitaker's personal appearance with the requisite indicia of formality and finality comparable to that of a written order. See *Arbor Farms*, 305 Mich App at 387-388. At most, and noting that some conversation on this matter seemingly occurred off the record, the court's overall statements merely implied or assumed that Whitaker would be personally present on the second day to testify, with just the single, isolated comment that Whitaker's counsel "have [his] people ready." This was ineffective to constitute a binding oral ruling commanding Whitaker's personal presence.

### 3. BASIS OF THE COURT'S SANCTION

Nevertheless, Farm Bureau is correct that the trial court based its dismissal not only on Whitaker's failure to appear, but also on the circumstances related to other witnesses in the case and the numerous resultant delays to trial. We acknowledge that the trial court's ultimate explanation for dismissal mostly relied on Whitaker's absence and willful decision to work instead of attending the second day of trial. And Whitaker is correct that the trial court's commentary regarding intentional gamesmanship occurred on the first day of trial and specifically related to calling the claims adjuster. However, when dismissing the case, the trial court explicitly noted the initial delay of trial caused by Whitaker calling the claims adjuster, the additional absence of his wife, and the prior representations of Whitaker's counsel that he would question Whitaker, his wife, and the care provider all before noon on the second day. Further, although not specifically reiterated in the trial court's reasoning, the record shows that the care provider, like Whitaker and his wife, was also absent that morning. As stated, the court noted that this witness, per Whitaker's counsel, should have been present and ready to testify.

Under these circumstances, we conclude at least some sanction was warranted under the court's power to manage its own affairs "so as to achieve the orderly and expeditious disposition of cases." See *Maldonado*, 476 Mich at 376. Whitaker caused numerous delays in what both parties asserted should have been a simple trial, and he willingly chose not to appear on the second day. That morning, three of Whitaker's four planned witnesses were absent, despite the prior statement of Whitaker's counsel that he would finish questioning all witnesses by noon. Notably, the only witness available on the second day of trial, the claims adjuster, was affiliated with Farm Bureau, not Whitaker. And although it occurred off the record, Whitaker himself apparently acknowledged that while he was not ready to testify the first day of trial, he would be ready the next day. Accordingly, it was proper to impose some sanction for the various delays and misrepresentations—and apparent gamesmanship—related to Whitaker's presentation of witnesses and his case generally.

-12-

## 4. EVALUATION OF AVAILABLE OPTIONS ON THE RECORD

The key remaining question is whether the trial court properly evaluated all available options on the record to conclude that dismissal with prejudice was a just and proper sanction in this case. While a close call, we conclude that although dismissal with prejudice was generally within the court's discretion under the instant circumstances, the court nevertheless abused its discretion by not explicitly and carefully evaluating all other available options, i.e., available lesser sanctions, on the record.

Here, the trial court never imposed any sanction for Whitaker's delays of trial until it dismissed this case. But the court provided extensive criticism at the first day of trial related to Whitaker's gamesmanship with calling the claims adjuster after already moving to exclude her. Despite its frustration with the associated delay, the court nonetheless adjourned trial to allow the adjuster to testify and allow Whitaker additional time to line up his remaining witnesses. Despite this allowance, Whitaker did not have his witnesses available and ready to testify on the second day of trial. The court then gave Whitaker's counsel the opportunity to contact Whitaker, and only dismissed the case after allowing Whitaker's counsel to respond to the motion to dismiss and learning that Whitaker willingly chose not to appear and would be working until that afternoon.

In doing so, the trial court provided detailed reasoning as to why dismissal with prejudice was appropriate, specifically noting the multiple delays Whitaker caused over consecutive days of trial and the unfairness of this—and any continued delay—to the jury, as well as Whitaker's willful decision not to appear on the second day. And while not explicitly mentioned by the court, a second adjournment and further delay of trial would at least marginally prejudice Farm Bureau, on top of the prejudice, albeit slight, from the first delay. Accordingly, while the court never explicitly addressed each *Vicencio* factor or specifically detailed why lesser sanctions were inappropriate, it's general decision to impose the drastic sanction of dismissal in light of Whitaker's *continued* delays of trial, after the court critically provided Whitaker an allowance regarding the initial delay, was within the range of reasonable and principled outcomes. Indeed, the court overall sufficiently explained its reasoning for dismissal in order to allow meaningful appellate review.

Nevertheless, *Vicencio* requires a more explicit consideration of specific alternative, lesser sanctions, which never occurred here. To understand this, the preceding authority on which *Vicencio* relies is helpful. In requiring that trial courts carefully evaluate all available options on the record before imposing the drastic sanction of dismissal, *Vicencio* cited to *Hanks v SLB Management*, 188 Mich App 656, 658; 471 NW2d 621 (1991). *Hanks* states the same rule, citing to MCR 2.313(B)(2). Importantly, MCR 2.313(B)(2) permits the court to order sanctions when an action is pending "as are just, including, but not limited to the following:

> (a) an order that [certain] matters . . . or other designated facts may be taken to be established for the purposes of the action . . . ;

> (b) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the party from introducing designated matters into evidence;

(c) an order striking pleadings or parts of pleadings, staying further proceedings . . . , dismissing the action or proceeding or a part of it, or rendering a judgment by default against the disobedient party;

(d) . . . an order treating as a contempt of court the failure to obey an order . . . ;

\* \* \*

In lieu of or in addition to the foregoing orders, the court may require the party . . . or the attorney advising the party, or both, to pay the reasonable expenses, including attorney fees, caused by the failure . . . .

Considering these authorities together, it appears *Vicencio* contemplates a specific and careful articulation on the record of the type of lesser sanctions addressed by this court rule in order to properly address all other available options before dismissal. See also *Gueye*, 343 Mich App at 494 (the trial court's analysis erroneously implied dismissal was mandatory under the circumstances, but Michigan law provided "a nonexhaustive list of five orders that a trial court may enter to sanction a plaintiff" for the particular failure). Accordingly, we ultimately agree with Whitaker that the trial court abused its discretion by never explicitly mentioning *specific* alternative sanctions, such as a monetary fine or holding individuals in contempt, on the record—and why dismissal was nevertheless warranted.[8] Given that the trial court otherwise sufficiently explained its basis for dismissal, however, and because dismissal generally was not an abuse of discretion under the facts here, we remand only for a narrow articulation on the record whether the court considers and deems inappropriate other lesser sanctions. See *Gueye*, 343 Mich App at 494-495 ("Here, the trial court did not properly analyze whether dismissal . . . was a just and proper sanction. The trial court simply ruled" that dismissal was warranted and seemingly required. "On remand, the trial court should consider the applicable factors discussed in *Vicencio* to determine whether the sanction of dismissal is appropriate . . . . Whether dismissal ultimately proves to be the appropriate resolution is for the trial court to decide.").

---

[8] Responding to the dissent, we decline to follow the approach taken in *Charlevoix Golf & Country Club, LLC v Troszak*, unpublished per curiam opinion of the Court of Appeals, issued January 24, 2012 (Docket No. 300892), for several reasons. First, the premise of *Charlevoix Golf*—that the trial court need not undertake any formulaic analysis so long as it "understood the gravity of the sanction [of dismissal] and imposed it only after considering the circumstances giving rise to the sanction," *id*. at 6—is contrary to *Vicencio*'s explicit instruction that courts not just carefully consider the availability of lesser sanctions, but do so *on the record*. Second, the trial court's limited default in *Charlevoix Golf* provides much stronger support that, while not explicit in the record, the court still implicitly evaluated other available options as contemplated by *Vicencio*.

-14-

## B. EXCLUSION OF BCBS BILLS

As stated, Whitaker also argues that the trial court abused its discretion by excluding from evidence his medical bills paid by Medicare, Medicaid, and BCBS (although the trial court in fact only excluded BCBS bills). As an initial matter, we agree with Whitaker that he incurred expenses related to the medical bills paid by BCBS and is not seeking a double recovery[9] in this action.

On these points, Whitaker relies on *Oostdyk v Auto Owners Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued December 30, 2014 (Docket No. 317221). In *Oostdyk*, the defendant no-fault insurer argued after trial, in relevant part, "that it should not have to pay medical bills that were paid by Golden Rule [a secondary commercial health insurer] and Medicaid because they were not outstanding at trial." *Oostdyk*, unpub op at 4. Various hospitals moved to intervene, "arguing that they erroneously accepted payment from Medicaid and Golden Rule for medical services provided to [the plaintiff] under the mistaken belief that no-fault benefits were not available." *Id*. The trial court granted the hospitals' motion to intervene, as well as a separate motion to intervene filed by Golden Rule. *Id*.

As particularly important here, this Court rejected the defendant's argument "that [the plaintiff]'s jury award should be reduced because his medical bills were paid by Medicaid and Golden Rule[, and the plaintiff thus] did not 'incur' the medical expenses." *Id*. at 14. The Court stated that the plaintiff

> became liable for his medical expenses when he accepted medical treatment, i.e., the expense was "incurred." If the expense was reasonably necessary, and the charge reasonable, [the] defendant became liable to pay it. The fact that other insurers mistakenly paid the expenses is irrelevant to the fact that [the plaintiff] "incurred" those expenses when he accepted medical treatment. And the other insurers are entitled to recover the amounts mistakenly paid on [the plaintiff]'s behalf when [the] defendant refused to pay those medical expenses. [*Id*.]

---

[9] Notably, much of Farm Bureau's argument, particularly a portion asserting that Whitaker is not entitled to double damages, relies on the availability of such relief under the Medicare Secondary Payer Act (the MSPA), 42 USC 1395y. See *Covenant Med Ctr v Farm Bureau Mut Ins Co of Mich*, unpublished per curiam opinion of the Court of Appeals, issued November 24, 2020 (Docket No. 350645) ("The MSPA provides for a private cause of action for double damages 'in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).' 42 USC 1395y(b)(3)(A). The MSPA also states that when a responsible primary plan does not 'promptly meet its obligations,' Medicare is authorized to pay the entire amount and the primary plan is then obligated to reimburse Medicare. 42 USC 1395y(b)(2)(B); *MSPA Claims 1, LLC v Tenet Florida, Inc*, 918 F3d 1312, 1316 (CA 11, 2019). The statute thus provides for recovery of double damages when a primary payer fails to pay or reimburse, but does not provide for double damages for tardy payment."). This case, however, does not involve any conditional payment by Medicare, nor any claim for double damages under the MSPA.

-15-

The *Oostdyk* Court then distinguished *Bombalski v Perry*, 247 Mich App 536; 637 NW2d 251 (2001).

In *Bombalski*, 247 Mich App 536, this Court affirmed limiting the plaintiff's recovery "of uncoordinated [PIP] benefits from [the] defendant to . . . amounts that [the] plaintiff's health care insurer paid in satisfaction of [the] plaintiff's medical bills." *Id*. at 538. Notably, the parties agreed the plaintiff was entitled to some amount of benefits from the defendant no-fault insurer, including for "the medical care coverage [the] plaintiff had received from his health insurer Blue Cross & Blue Shield, but [they] disputed the appropriate amount of medical benefit reimbursement." *Id*. at 539. This Court rejected the plaintiff's argument that he incurred and should recover "the full amounts charged by the health care providers when he accepted their services." *Id*. at 540-546. The Court reasoned that such recovery "would afford [the] plaintiff a windfall above his entitlement to uncoordinated, double benefits for any inflated medical charges he received." *Id*. at 545. "We therefore conclude that . . . incurred charges within MCL 500.1307(1)(a) do not encompass any amounts (1) exceeding those that [the] plaintiff's health insurer actually paid in satisfaction of [the] plaintiff's medical bills and (2) for which [the] plaintiff no longer bears legal responsibility." *Id*. at 546.

The *Oostdyk* Court specifically distinguished *Bombalski* as follows: "The *Bombalski* plaintiff was not liable for any medical bills because they had been paid in full by his health care provider; the plaintiff was merely seeking a double recovery." *Oostdyk*, unpub op at 15. "Here, [the plaintiff] was not seeking a double recovery; rather, he was seeking to recover PIP benefits and the jury determined that he was entitled to those benefits." *Id*. "[T]his case is not an attempt by [the plaintiff] to receive a 'windfall' or 'double recovery' so that he could pocket the difference between the amounts paid by his insurers and the amounts charged by the hospitals. Instead, the verdict created a situation in which the hospitals in effect have not been paid for the services provided contrary to the no-fault act." *Id*.

Here, like in *Oostdyk* and unlike in *Bombalski*, Whitaker is not seeking any windfall or double recovery related to the difference between the amounts paid by his insurers and the amounts charged by his medical providers. Instead, he seeks recovery only for the amounts actually paid by BCBS, his insurer. And both *Oostdyk* and *Bombalski*, by still permitting recovery for the amounts actually paid by the respective non-no-fault insurer in each case, clearly show that such expenses are incurred by plaintiffs, and therefore were incurred by Whitaker here, as necessary for recovery under the no-fault act.

Questions remain, however, regarding whether Farm Bureau was indeed first in priority and responsible for Whitaker's PIP benefits and, if so, whether Equian or BCBS—but not Whitaker—had to assert their subrogation interest in this or another action for reimbursement of the bills BCBS paid. If Farm Bureau was not liable for Whitaker's benefits regarding the BCBS bills, or if Whitaker himself could not assert another party-in-interest's right to subrogation here, then the bills were properly excluded from evidence.

"MCL 500.3172(1)(a) states that a claimant 'may claim [PIP] benefits through the [MACP] if . . . [n]o personal protection insurance is applicable to the injury.' " *Esurance Prop & Cas Ins Co v Mich Assigned Claims Plan*, 507 Mich 498, 513; 968 NW2d 482 (2021) (alterations and omission in original). Further, "under MCL 500.3172(2), an insurer providing benefits under the

assigned-claims plan is generally entitled to a setoff for *any other benefits* covering the same loss that are received by or on behalf of the injured party. The only statutory exemption to the right to a setoff is if the benefits covering the loss are received under either Medicare or Medicaid." *George*, 329 Mich App at 452. In this manner, this case is less about priority (contrary to Whitaker's framing of the issue) than it is about Farm Bureau's right (or lack thereof) to setoff for BCBS's paid benefits *despite* Farm Bureau's priority as the assigned no-fault insurer.

In *George*, the plaintiff lacked automobile insurance, so her no-fault claim was assigned to the defendant. *Id*. at 449-450. Like Whitaker, she also had health insurance through a self-funded ERISA plan. *Id*. at 450. The Court concluded that a health plan under ERISA that is self-funded "and contain[s] an unambiguous COB [coordination of benefits] clause" preempts state law regarding the coordination of benefits. *Id*. at 459. The Court elaborated:

> [L]ike a COB clause, MCL 500.3172(2) provides for the coordination of benefits. Specifically, it establishes that where duplicative benefits are available, i.e., where benefits from multiple sources cover the loss, the assigned-claims insurer is entitled to a setoff, meaning the insurer is *not* primarily liable. In this case, there is a state law expressly providing that [the plaintiff]'s ERISA plan is primary whereas the ERISA plan expressly disavows primacy under these circumstances. Because [the plaintiff]'s ERISA plan is self-funded and because it contains an unambiguous COB clause, [the defendant] is primarily liable for the benefits at issue here. To hold to the contrary would have the direct effect of dictating the terms of the ERISA plan, which the state is not permitted to do under federal law. [*Id*. at 460.]

Here, Farm Bureau would generally be entitled to a setoff for benefits covered from other, non-Medicare or -Medicaid sources like BCBS, unless MCL 500.3172(2)'s coordination-of-benefits provision is preempted like in *George*. But Whitaker, unlike the plaintiff in *George*, never provided any evidence of the BCBS policy itself to establish not only that his was a self-funded ERISA plan (which the Equian letters do support), but that it also contained unambiguous coordination-of-benefits language. The trial court, lacking this evidence essential to (1) preempting the general setoff provision for an assigned no-fault-insurer and (2) rendering Farm Bureau liable for benefits paid by another provider, did not abuse its discretion by excluding from evidence the bills paid by BCBS.

Nevertheless, we agree with Whitaker that *if* Equian or BCBS was entitled to reimbursement from Farm Bureau, he could properly assert recovery for BCBS's payments himself in this action. MCR 2.202(B) relates to proceedings involving a change or transfer of interest and states:

> If there is a change or transfer of interest, the action may be continued by or against the original party in his or her original capacity, unless the court, on motion supported by affidavit, directs that the person to whom the interest is transferred be substituted for or joined with the original party, or directs that the original party be made a party in another capacity. Notice must be given as provided in subrule (A)(1)(c).

Along with this court rule, Whitaker's argument relies on *Eller v Metro Indus Contracting, Inc*, 261 Mich App 569; 683 NW2d 242 (2004). This case involved "Metro Industrial Contracting, Inc.'s (Metro), third-party action for indemnification against third-party defendant Mid-American Gunite, Inc. (Gunite), arising out of an accident at a construction site." *Id*. at 570.

> Gunite first argues that the trial court erred in denying its motion for summary disposition and in entering judgment in favor of Metro where Metro already had been fully indemnified by Power Process Piping, Inc. (PPP), a co-indemnitor. Additionally, Gunite argues that Metro's indemnification claim was rendered moot by PPP's satisfaction of the full judgment amount against Metro. [*Id*. at 571.]

Addressing these arguments, this Court first noted "that PPP and Gunite were both potentially liable to indemnify Metro under the terms of their respective written subcontract agreements with Metro that contained identical indemnification clauses." *Id*. at 572. The Court stated, "By satisfying Gunite's indemnification obligation, PPP became subrogated to Metro's rights against Gunite." *Id*. at 573. As particularly relevant here, the Court provided the following discussion of this doctrine:

> As our Supreme Court explained,

>> equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other. It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a mere volunteer.

> \* \* \*

> . . . [W]hen an insurance provider pays expenses on behalf of its insured, it is not doing so as a volunteer. This is true even if the insurer's obligation was only secondary to another carrier's, so that it would not have been liable to pay benefits until the policy limits of the primary carrier were exhausted. The rationale is that an insurance company that pays a claim that another insurer may be liable for is protecting its own interests and not acting as a volunteer . . . [and] is entitled to invoke the doctrine of equitable subrogation. [*Id*. at 573-574 (quotation marks and citations omitted; omission and alteration in original).]

Next, the Court reiterated that "PPP became equitably subrogated to Metro's right to assert an indemnity claim against Gunite for half of Metro's share of the principal judgment." *Id*. at 574. The Court then stated, "Where a party pays the debt of another pursuant to an obligation, it becomes the real party in interest and a substitution of parties may be appropriate." *Id*. at 574-575. "However, the court rules allow a preexisting action to proceed with or without a substitution of parties." *Id*. at 575. After citing MCR 2.202(B), the Court concluded: "Although the trial court could have required that PPP be substituted as a third-party plaintiff, it was not required to do so and it did not err in allowing Metro to proceed with its third-party claim against Gunite." *Id*.

Here, Equian (and/or BCBS) became equitably subrogated to Whitaker's no-fault claim against Farm Bureau when paying Whitaker's bills that may have been Farm Bureau's responsibility under the no-fault act. Equian thus became the real party in interest, and substitution *may* have been appropriate. But under the plain language of MCR 2.202(B) and the circumstances of this case, the trial court should have allowed Whitaker to assert Equian's interest regarding the BCBS bills without a substitution of parties. Specifically, the court never directed that Equian or BCBS be substituted for or joined with Whitaker, or directed that Whitaker be made a party in another capacity.

In sum, Whitaker incurred expenses as defined by the no-fault act concerning his medical bills paid by BCBS, and he is not seeking a double recovery. But the trial court did not abuse its discretion by excluding the BCBS bills because Whitaker failed to present evidence necessary to exempt the bills from the general setoff provision applicable to assigned no-fault claims. Had Whitaker established that a setoff was inapplicable, however, the trial court should have allowed him to assert Equian and/or BCBS's subrogation interest in this action.

## IV. CONCLUSION

We affirm the trial court's evidentiary ruling but remand for the trial court to consider alternatives short of dismissal on the record before dismissing this case with prejudice. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Adrienne N. Young

-19-